STATE OF MARYLAND, to Use of KAUPP et al., v. ELLICOTT et al.

(District Court, D. Maryland. April 28, 1910.)

*(Syllabus by the Court.)*

SEAMEN (§ 29*)—INJURIES TO SEAMEN—SEAWORTHINESS OF VESSEL.

The owners of a dredge built in the United States for use on the Panama Canal are not under obligation to seamen employed on such dredge while being towed to the Isthmus of Panama to make such a dredge as seaworthy for such voyage as they would be required to make an ordinary ship. All they are required to do is to make the dredge as fit for such voyage as such a dredge can be reasonably made.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 186–194; Dec. Dig. § 29;* Master and Servant, Cent. Dig. § 211.]

In Admiralty. Libel by the State of Maryland, to the Use of Copeland G. Kaupp and others, against Charles E. Ellicott and others. Decree for defendants.

This is a libel in personam, in the name of the state of Maryland, for the use of the widow and children of Martin J. Kaupp, the engineer on board a certain steam dredge, known as "No. 4,300," and by Charles J. Meyd and John G. Duffy, late seamen on board of such dredge, against a copartnership known as the Ellicott Machine Company and the American Towing & Lightering Company, a corporation, owner of the steam tug Tormentor. The dredge, No. 4,300, was built in Baltimore by the Ellicott Machine Company under contract with the Isthmian Canal Commission. The contract price was to be $158,000, which was to be paid in instalments. Ninety per cent. of it was paid before the dredge left Baltimore; but by the contract all responsibility for the safe delivery of the dredge at Colon was assumed by the Ellicott Machine Company.

The dredge was prepared for its long voyage by erecting strong timber bulwarks outside of and around the house, so as to protect the house from the violence of any seas which might come aboard. The evidence showed that this method of protection was that usually employed and was approved by the marine underwriters. The dredge carried in all 7 men—a master, an engineer, and 5 seamen. By the contract it was to be equipped with a metal lifeboat weighing about 1,200 pounds and capable of carrying 25 men. Such boat was stowed on the after main deck. The testimony showed that it rested on blocks, and that coal in bags was stowed around the lifeboat. The testimony as to how this coal was stowed with reference to the lifeboat was conflicting; the witnesses for the libelants claiming that it was wedged tightly in and about the lifeboat in such manner as to make it difficult or impossible promptly

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to launch the boat. The witnesses for the respondent, on the other hand, claimed that the coal was not so placed as to amount in fact to any obstruction to the launching of the boat.

The dredge left Baltimore on the forenoon of December 9, 1909, in tow of the tug Tormentor. It had good weather until the afternoon of Sunday, December 12th, when it had reached a point somewhat south of Cape Lookout. The wind then shifted to the south and southeast, and grew in force from the afternoon of Sunday, the 12th, until about 4 o'clock in the afternoon of Monday, the 13th. About 5:15 Monday morning, or somewhere like an hour or an hour and a half before daybreak, those on board the dredge heard a tremendous crash. They at once aroused the master, who went forward, and presently returned and called to the crew that the bulwarks had crashed in and that the house was smashed, and directed them all to run for the lifeboat. The survivors, who were examined, testified that the crew did run for the lifeboat; that all six got around it, cut its lashings, fitted it with a painter, and tried to launch it, but were unable on account of the coal to move it more than some six inches; that the master went to the upper deck, blew four long and four short blasts on the whistle, turned the searchlight vertically up, and waved a white light. While the men were around the lifeboat, the bow of the dredge went under water, and in an instant the stern followed. Two or more of the men jumped into the lifeboat as the dredge went down; but the lifeboat was caught, apparently, by the wire ropes which supported a portion of the dredging apparatus, and which ropes were 18 to 20 feet above the deck. One of these ropes cut the lifeboat nearly in two.

Those on the tug testified that, while they had been keeping close watch on the dredge, they saw no signals, and were not aware that anything had happened until the lights on the dredge suddenly disappeared, and then in a moment they found that the tug was acting as if anchored from the stern. On running back to the hawser, they found that the dredge had sunk. The hawser was at once cut, and the tug so manœuvered as to keep in the immediate vicinity until daylight. At daylight some of the crew of the dredge were discovered still floating on the wreckage, and between 6:45 and 8:15 a. m. three of them were picked off the wreckage, apparently not greatly the worse for their experience. The other four, including the master, the engineer and two of the seamen, were drowned.

The engineer was some 47 years of age, and had been for a number of years making from $65 to $80 a month. He gave to his wife, for the support of his family, all that he made except $10 a month. Since his death she has been compelled to obtain employment in a laundry at $5 a week.

George T. Mister, for libelants.

Carey, Piper & Hall, for respondent Ellicott Machine Co.

Robert H. Smith, for respondent American Towing & Lightering Co.

Before MORRIS and ROSE, District Judges.

MORRIS, District Judge (orally, after stating the facts as above). During the recess, my Brother ROSE and I have conferred in regard to this case, and we find that we need not call upon the respondents to reply. We have concluded that, so far as the tug Tormentor is concerned, no case at all has been made out against her. The only alleged fault which might be urged against her is the failure to observe the signals of distress from the dredge.

We do not think this alleged fault is sustained by proof. To our minds it is exceedingly doubtful whether the signals which are alleged to have been given were in fact given—at least, that they were given in such a way that they could be observed from the tug. A signal, by the whistle, if given, could hardly be heard, as the tug was about a quarter of a mile ahead of the dredge, and a very high wind was blow-

ing directly against the sound. The signal by the searchlight, which is spoken of as having been shown perpendicularly toward the sky, would not be very noticeable or very suggestive. And we cannot ignore the direct affirmative testimony that a diligent observation of the dredge was kept by those on the tug, and that no signal of any kind was observed. It must be taken into account, in considering the conflicting testimony, that the sea was running very high, and the night was very dark, which made it exceedingly difficult to observe the signals, if they were given. We conclude that no fault is proved against the tug.

Then, as to the dredge, for the purposes of this case we will take it to be the law that if the owners of the dredge sent her to sea to make this proposed voyage in an unfit condition, and her unfitness resulted in the disaster, then they are liable to the libelants. But a dredge is a very different character of vessel from an ordinary steamer or sailing vessel, and to put this loss upon the owners of the dredge the proof should be convincing, and not such as to leave the conclusion doubtful. The unseaworthiness complained of resolves itself into two allegations:

First. That the protecting woodwork, called by some the falsework and by some the bulwark, which was built up around the outside of the house to fortify it against the force of the waves, was unsafe. The sending of the dredge to be towed on the open sea was unusual and exceptional, and an extra hazard, and it was known to be so by every one concerned, and there can hardly be said to be any well-established standard, based upon experience, as to what protection is sufficient. The kind of protection put on this dredge had been in use for a number of years and had proved effective. It was thought to be sufficient by the builders, and by their experts, and we are not warranted in saying that it was manifestly insufficient.

Second. It is urged most earnestly that the lifeboat was stowed on the after main deck in a manner which prevented its use in an emergency. This is a question of fact of some difficulty. If the proof satisfied us that there was time to launch the lifeboat, and the boat was not launched because of the improper way in which it was placed, it might be taken to be the proximate cause of the drowning of the engineer. But the proof tends to show that there was no time to launch the boat, no matter how favorably it was placed, provided it was securely placed where it could be safely carried during the voyage. Indeed, the exact cause of the sudden sinking of the dredge is left in doubt. The only explanation, by those most competent to speak, is that during the storm a wave of extraordinary size struck the dredge and broke in the house, filling the hold of the dredge with water, so that with the pull on her by the hawser she did not rise on the waves, but went suddenly to the bottom; there being no time for the men to launch the boat, or save the seamen's effects, or do anything, except to seize upon pieces of the wreckage and try to save themselves.

We have no reason to think from the testimony that the captain of the dredge was incompetent, and he evidently risked his own life on the sufficiency of the equipment. We both feel very deeply the tragic nature of the deplorable disaster and the cruel misfortune that has

179 F.—9

fallen on the wife and children of the engineer who lost his life, but we do not find that the facts proven justify a decree in their favor.

ROSE, District Judge. I concur fully with the conclusions announced by the Presiding Judge. To common knowledge such a dredge as that out of the loss of which this case arises cannot be made anything like as safe for a sea voyage as can a ship whether propelled by sails or steam. The standard of seaworthiness with reference to such a dredge is, therefore, very different from that required of a ship. The testimony of the insurance expert is to the effect that experience leads underwriters to charge from three to five times as much for insuring such a dredge on a sea voyage as they would charge for insuring a ship.

The law as it has been established for many years, and can be changed only by the Legislature, and not by the courts, says that where the risks of an employment are obvious to the employé when he enters into the employment he accepts the risk of the employment; that is to say, put in another way, he himself becomes his own insurer against those risks. If he is injured or killed as a result of those risks, neither he nor his have any claim upon his employer, unless the employer has in some way failed to do something which the employer ought to have done and the not doing of which has caused or contributed to the injury of the employé.

In this case, by its contract with the United States, the Ellicott Machine Company assumed the risk of delivering the property—that is to say, the dredge—safely at Colon. That property was worth $158,000. It doubtless protected itself against that risk by charging a price for the dredge as much in excess of the price at which it would have been willing to deliver the dredge at Baltimore as would compensate it for the actual outlay of towing the dredge from Baltimore to Colon and for insuring it against the risks to which the dredge would be exposed during the voyage. In part this protection was secured by insuring the dredge with the Marine Insurance Underwriters, and in part by itself becoming its own insurer.

The marine engineer, for the loss of whose life this libel in part is filed, put his life at the risk of the voyage. In dollars and cents that life was to his family worth somewhere from $5,000 to $10,000. Let us assume that it was worth $7,500. If the rate of insurance on life for such a voyage would have been as high as on property, the risk he was assuming would have been worth somewhere from $125 to $250. It appears from the testimony that the services of a competent marine engineer, without unusual risk, were worth $65 to $80 a month. The voyage to Colon and return would, perhaps, have taken something over a month. He was to receive $75 a month. On the legal assumption, binding on this court, that he with his eyes open assumed the risk of the employment, he for $100 gave his services and assumed an underwriter's risk, for which latter alone he ought to have received from $125 to $250.

Under such circumstances it is, of course, quite to be expected that those whose whole condition in life has been so greatly and disastrously

changed by his death should try to hold those who employed him to go on the voyage liable for the loss or some part of the loss they suffered. This, under the law, they can do if they can show that the employer failed in some duty that it owed the employé, and they cannot do it unless they can show such failure. This, as Judge Morris has pointed out, they have not done. Their husband and father lost his life, not because the Ellicott Machine Company or the American Towing Company were negligent or failed in any duty the law put upon them, or either of them, but because the work he assumed to do was a perilous work. Whether it would not be far better that the law should recognize that such loss of life is a part of the necessary cost of the business, and require it to be borne by the business, is a matter for the legislative, and not the judicial branch of the government.

In this as in most other such cases, the cost of the trial to the respondents, successful, as by the decree we will pass they will be, will doubtless exceed, perhaps considerably exceed, the cost of insuring all the men on the dredge against the risks of the voyage. In so saying I do not intend to suggest that the Ellicott Machine Company were, as the law is, under any moral, much less any legal obligation to have provided such insurance.